407 F.2d 330
 132 U.S.App.D.C. 200
 AUTOMOTIVE PARTS & ACCESSORIES ASSOCIATION, Inc., Petitioner,
v.
Alan S. BOYD, Secretary of the Department of Transportation,
et al., Respondents, Automotive Service Industry
Association, Intervenor.
STERLING PRODUCTS COMPANY, Inc., Petitioner,
v.
Alan S. BOYD, Secretary of the Department of Transportation,
et al., Respondents.
 Nos. 21820, 22015.
 United States Court of Appeals District of Columbia Circuit.
 Argued Sept. 24, 1968.
Decided Dec. 27, 1968.
 
 Mr. Milton Eisenberg, Washington, D.C., with whom Mr. James B. Blinkoff, Washington, D.C., was on the brief, for petitioners. Mr. Richard H. Murray also entered an appearance for petitioner in No. 22,015.
 Asst. Atty. Gen. Edwin L. Weisl, Jr., with whom Messrs. Morton Hollander and Norman Knopf, Attys., Department of Justice, were on the brief, for respondents. Mr. Robert V. Zener, Atty., Department of Justice, also entered an appearance for respondents in No. 22,015.
 Mr. J. Austin Latimer was on the brief for intervenor in No. 21,820.
 Before BAZELON, Chief Judge, and MCGOWAN and ROBINSON, Circuit judges.
 McGOWAN, Circuit Judge:
 
 
 1
 These consolidated review proceedings are among the first to be initiated under the National Traffic and Motor Vehicle Safety Act of 1966 (Safety Act), 15 U.S.C. 1381-1409 (Supp. III, 1968). The object of this challenge is Motor Vehicle Safety Standard No. 202, 33 Fed.Reg. 2945 (1968), which requires that, effective January 1, 1969, all new passenger cars manufactured for sale in this country must be factory-equipped with front seat head restraints which meet specific federal standards. Petitioners are not motor car manufacturers but, rather, a manufacturer of auto accessories, including head restraints (Sterling Products Co., Inc), and two trade associations representing persons engaged in the auto accessory business (Automotive Parts & Accessories Association, Inc. (APAA), and Automotive Service Industry Association (ASIA)). Their common grievance appears to flow not from the recognition and establishment of the head restraint as an essential safety device but from the adverse impact upon their business inherent in a vehicle standard which necessarily requires that the head restraints be factory installed.[1] Their attack upon the Standard takes two major forms. One is procedural in nature, raising a number of issues as to the manner in which the legislative grant of authority was exercised. The other goes to the merits of the Standard, including, interestingly enough, contentions-- made here for the first time-- that head restraints endanger, rather than promote, passenger safety. We deal with them separately hereinafter, although the conclusion we reach in each instance is the same, namely, that the Standard is to be left undisturbed.
 
 
 2
 * In the procedural area, petitioners claim that respondents[2] misconceivedtheir authority under the Act with respect to the kind of rule making proceeding they could hold. This issue can be posed simply as whether the rule making procedures provided by Section 4(b) (informal rule making) of the Administrative Procedure Act (APA)[3] were appropriate for the promulgation of this safety standard, or whether the Safety Act requires the more stringent procedures of Sections 7 and 8 of the APA (formal rule making).[4] Which of these two sets of APA provisions applies is governed by whether the underlying agency statute, here the Safety Act, requires the rule 'to be made on the record after opportunity for agency hearing.' APA 4(b).
 
 
 3
 There is no issue between the parties as to which procedure was employed in the promulgation of the Standard, since respondents do not purport to have engaged in anything other than informal rule making. Neither do we understand petitioners to be asserting inadequacies in the procedure if measured by Section 4 of the APA alone. At any rate, the evolution of the Standard has, in our view, been wholly in conformity with the contours of that section of the statute, for there was the required notice, 'an opportunity to participate * * * through submission of written data, views, or argument,' and 'a concise general statement of (the rule's) basis and purpose' when it was issued.
 
 
 4
 It was on November 30, 1966, that the respondent Boyd first issued a notice of proposed rule making under the Act. 31 Fed.Reg. 15,212-13, 15,218-19 (1966). That notice related to twenty-three suggested safety standards, only one of which involved head restraints. Written comments were invited to be submitted by January 3, 1967. On the following January 31, respondent Bridwell issued rules as to twenty of the proposed subjects, 32 Fed.Reg. 2408-10 (1967); he did not act with respect to head restraints because he thought it desirable to seek further information. Accordingly, on the same day, he issued a new notice of proposed rule making with respect to head restraints, and he invited written comments to be submitted by the following May. 32 Fed.Reg. 2417-18 (1967). As a part of the consideration process, a meeting was held by respondents on November 14, 1967, with both car and accessory manufacturers, and other interested persons. On December 22, 1967, a notice was issued embodying the proposed Standard, and written comments about it were invited by January 26, 1968. 32 Fed.Reg. 20865 (1967). The Standard was promulgated on February 12 thereafter. 33 Fed.Reg. 2945 (1968).
 
 
 5
 The Standard as issued reflected certain alterations responsive to comments received, but the announcement accompanying it noted that the changes proposed by those interested in accessory equipment had been rejected for the reasons indicated. Various participants in the proceedings, including petitioners, filed petitions for reconsideration. On May 20, 1968, petitioners were sent a letter by respondents denying their request for the reasons stated therein.
 
 
 6
 Petitioners' central claim is that the Standard is invalid because this manner of proceeding was unauthorized from the beginning since it did not comport with the requirements of Sections 7 and 8 of the APA. This is not a complaint which petitioners appear to have directed to respondents during the course of the proceeding itself, nor in their request for reconsideration.[5] There is, thus, a serious question as to whether they should now be permitted to press the matter for the first time here. Respondents have, however, chosen to deal with it on the merits, and the public interest in the effective administration of the new Safety Act argues for our doing the same.
 
 
 7
 The question, as we have said, turns upon whether Congress, under the Safety Act, required the rule 'to be made on the record after opportunity for agency hearing.' APA 4(b). The Safety Act contents itself with what is, in this context, the somewhat Delphic pronouncement that 'the Administrative Procedure Act shall apply to all orders establishing, amending, or revoking a Federal motor vehicle safety standard under this subchapter.' Section 103(b), 15 U.S.C. 1392(b) (Supp. III, 1968). Since the APA contains both Section 4(b), on the one hand, and Sections 7 and 8, on the other, this treatment falls somewhat short of the apogee of the legislative draftsman's art. In any event, the classic conditions are present for recourse to legislative history for illumination of the Congressional purposes vis-a-vis formal and informal rule making.[6]
 
 
 8
 What emerges from this quest is reasonably explicit, and it points away from where petitioners would have us go. The Senate version of the Safety Act expressly stated that rules would be prescribed in accordance with Sections 3, 4, and 5 of the APA, and that 'nothing in this title or in the Administrative Procedure Act shall be construed to make Sections 7 and 8 * * * applicable.' See S.Rep. No. 1301, 89th Cong., 2nd Sess. 25-26 (1966). The House bill, on the other hand, simply stated that the APA would apply, without discriminating among its parts. In explaining this provision however, the accompanying committee report stated that 'the Secretary may utilize either the informal rule making procedure of section 4 of the APA or the more formal and extensive procedures of that act * * *.' H.Rep. No. 1776, 89th Cong., 2nd Sess. 16 (1966). In conference the language of the House version was adopted. In explaining the Conference Bill on the floor of the Senate, Senator Magnuson, the sponsor of the Act and a conferee, pointed out that the change in no way threatened the legitimacy of informal rule making procedures, but instead was only to allow the Secretary to adopt formal procedures should he wish to do so in a particular instance:
 
 
 9
 With respect to sections 7 and 8 of the Administrative Procedure Act, which apply to formal hearings, the Senate bill had expressly provided that these sections would not apply to standard-setting procedures under the act. It was the clear understanding of the conferees, however, that under the language of the House bill, the Secretary will utilize the informal rulemaking procedures of section 4 of the Administrative Procedure Act; and that he need hold a formal hearing under sections 7 and 8 only if he determines that such hearing is desirable. 112 Cong.Rec. 20600 (daily ed. August 31, 1966).
 
 
 10
 Quite apart from this concrete evidence of Congressional intent, an examination of other provisions of the Act, as well as the particular function which the Secretary is to perform, serves to reinforce the view that informal rule making was appropriate. First, the Act provides for the Secretary to consult informally with the National Motor Vehicle Safety Advisory Council, 15 U.S.C. 1393(b), as well as various state, interstate and legislative committees. 15 U.S.C. 1392(f)(1)(2), 1396 (Supp. III, 1968).[7] Also, the Act contemplates that, within the Department, experimentation and research will be used to generate data useful in formulating safety standards. 15 U.S.C. 1392(f)(1), 1395 (Supp. III, 1968). Both of these approaches are far more consistent with informal than with formal rule making. More importantly, they only further emphasize the inherently legislative nature of the task which the Act delegates to the Secretary and his subordinates. In this context, where the Department is concerned with the issuance of rules requiring basic policy determinations rather than the resolution of particular factual controversies, the informal procedures provided by Section 4(b) of the APA are appropriate.
 
 
 11
 In the face of this formidable threat to their position from both the legislative history and the general structure of the Act itself, petitioners refer to the judicial review provisions of the Safety Act,[8] and argue that they make manifest a Congressional intent that the 'rules are required by statute to be made on the record after opportunity for an agency hearing,' APA 4(b), and therefore are to be the product of formal rule making. This is said to be implicit in (1) the requirement that, where review is sought of an order establishing a standard, there shall be filed in court 'the record of the proceedings on which the Secretary based his order,' (2) the jurisdiction given the court to review safety standards 'in accordance with' Section 10 of the APA, and (3) the provision made for a remand by the court, at the request of a petitioner for the taking of additional evidence. Petitioners argue that all these aspects of the judicial review contemplated and authorized by the Safety Act are instinct with the idea of a record compiled in formal evidentiary hearings, from which record the agency makes findings and conclusions required to be supported, in the familiar adjudicatory sense, by substantial evidence in the record. Otherwise, so it is said, the judicial review provisions would be meaningless.
 
 
 12
 We are not persuaded that this is so, at least when the matter is weighed against the backdrop of legislative history set forth above. As to petitioners' first contention, there is a record compiled in a Section 4 proceeding, and available for filing in court. It consists of the submissions made in response to the invitations issued for written comments. And, as to the third, a court could, at the instance of a petitioner dissatisfied with the state of such a record, remand it to the agency for the receipt of further expressions of views and related information. Thus, there is nothing in these two provisions from the Safety Act's judicial review section which renders them completely inapt in relation to judicial scrutiny of the product of a Section 4 proceeding; and Congress can, accordingly, be rationally taken as having fashioned them with such a proceeding in view.
 
 
 13
 Petitioners press closely upon us the reference in the judicial review provisions of the Safety Act[9] to Section 10 of the Administrative Procedure Act. They point to paragraph (e)[10] of Section 10 which, as its title indicates, is generally concerned with the scope of the review by a court of agency action, and, in particular, to subparagraph (B)(5) which directs that the court shall set aside agency action 'unsupported by substantial evidence in a case subject to (Sections 7 and 8 of the APA) of otherwise reviewed on the record of an agency hearing provided by statute.'[11] We think that this language of Section 10, although not free from ambiguity, suggests that this 'substantial evidence' standard for judicial review is addressed to the review of formal hearings, either under Sections 7 and 8 or other special statutory provision. Since we have found that a formal hearing is not required by the Safety Act, Subsection (B)(5) by its own terms appears to have no application to this case. See California Citizens Band Ass'n v. United States, 375 F.2d 43, 53-54 (9th Cir.), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). This is not to say, however, that Congress has given no guidance as to the proper standards for judicial review of informal proceedings. Section 10(e) is, as noted above, addressed in the large to scope of review, and subsection (B)(5) is only one of its components. The other standards set out in that section, all of which would apply to informal rule making, allow an appellate court to apply 10(c) quite apart from subsection (B)(5).
 
 
 14
 In any event, although the judicial review provisions of the Safety Act and the APA contain some terms which are normally associated with formal evidentiary hearings, we refuse to infer that Congress, in this unnecessarily oblique way, intended to require the procedures of formal rule making for the issuance of safety standards. To do so would be to negate the specific legislative history and general Congressional purpose which in our view clearly demonstrate that issuance of standards by informal rule making was to be permissible.
 
 
 15
 This conclusion disposes of petitioners' insistence that the Standard is defective because it has not been accompanied by specific and detailed findings and conclusions of the kind customarily associated with formal proceedings. The Supreme Court long ago rejected this kind of an argument, see American Trucking Ass'ns v. United States, 344 U.S. 298, 320, 73 S.Ct. 307, 97 L.Ed. 337 (1953), as has this court. See Van Curler Broadcasting Corp. v. United States, 98 U.S.App.D.C. 432, 434-435, 236 F.2d 727, 729, cert. denied, 352 U.S. 935, 77 S.Ct. 226, 1 L.Ed.2d 163 (1956); Logansport Broadcasting Corp. v. United States, 93 U.S.App.D.C. 342, 345-346, 210 F.2d 24, 27-28 (1954). Section 4(b) of the APA says in terms that the agency, after considering the relevant matter received by it in response to its invitation of comments, 'shall incorporate in the rules adopted a concise general statement of their basis and purpose.'We think also that the statement in the text of the promulgation of the Standard, when considered in the light of the reasons stated by the Administrator's denial of rehearing, is 'a concise general statement' which passes muster under Section 4 of the APA.[12] However, on the occasion of this first challenge to the implementation of the new statute it is appropriate for us to remind the Administrator of the ever present possibility of judicial review, and to caution against an overly literal reading of the statutory terms 'concise' and 'general.' These adjectives must be accommodated to the realities of judicial scrutiny, which do not contemplate that the court itself will, by a laborious examination of the record, formulate in the first instance the significant issues faced by the agency and articulate the rationale of their resolution. We do not expect the agency to discuss every item of fact or opinion included in the submissions made to it in informal rule making. We do expect that, if the judicial review which Congress has thought it important to provide is to be meaningful, the 'concise general statement of * * * basis and purpose' mandated by Section 4 will enable us to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did.
 
 
 16
 Because the 'concise general statement' envisaged by Congress is something different from the detailed 'findings and conclusions' on all 'material issues of fact, law, or discretion' referred to in Section 8, there will inevitably be differences of emphasis and approach in the application of the judicial review standards prescribed in APA 10. An adversary lawsuit, which most closely resembles the formal hearing of Sections 7 and 8, throws up issues of law and fact in a form quite unlike those which take shape in informal rule making, which has many analogies to a legislative committee hearing. When the issue on appeal is whether a rule made in informal proceedings meets the criteria of Section 10, the court must necessarily go about the application of that standard in a manner unlike its review of findings of fact and conclusions of law compiled in a formal proceeding.
 
 
 17
 This exercise need be no less searching and strict in its weighing of whether the agency has performed in accordance with the Congressional purposes, but, because it is addressed to different materials, it inevitably varies from the adjudicatory model. The paramount objective is to see whether the agency, given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future. With this concept of the scope of review enjoined upon us by the interaction of the Safety Act and Section 10 of the APA, we turn to petitioners' attack upon the merits of the Standard.
 
 II
 
 18
 Petitioner APAA, by letters dated November 20, 1967 and January 22, 1968, responded to the invitation to comment extended in the notices of proposed rule making. It also, jointly with petitioner Sterling, filed a petition for reconsideration after the Standard had been promulgated. The first letter, in the following words, sounded the pervasive theme of all the subsequent representations:
 
 
 19
 'The APAA's concern is based entirely on the anticompetitive and other undesirable effects of action by the National Traffic Safety Agency which results in reducing the market for approved auto parts and accessories produced by independent equipment manufacturers and retailers * * *.'
 
 
 20
 In all three documents, objection was made to any standard which would require factory implemented head restraints because, quite apart from depriving petitioners of sales, it would result, so it was said, in:
 
 
 21
 a. higher costs for the consumer;
 
 
 22
 b. an aggravation of monopolistic conditions in the auto industry;
 
 
 23
 c. Longer delays and lead times in implementing the original standard, as well as subsequent improvements;
 
 
 24
 d. encouragement of minimum standards; and
 
 
 25
 e. deprivation of consumers' choice.
 
 
 26
 It was further argued that, if the standard were to apply to the equipment and not to the vehicles themselves[13] (in other words, if all head restraints had to meet the Federal standards but there was no requirement that they be in place as the cars leave the factory), there would be:
 
 
 27
 a. continual improvement and innovation through competition;
 
 
 28
 b. consumer choice (allowing each consumer to buy a head restraint which was best for a person of his size); and
 
 
 29
 c. faster implementation of the standard.
 
 
 30
 It was also urged that there were no technical reasons why head restraints had to be factory installed, that the independent manufacturers had already produced millions of head restraints, and that installation was simple and inexpensive; and that 'any possible ease in enforcement * * * cannot and should not be the sole criteria' for preferring factory implementation.
 
 
 31
 The alternative suggested by petitioners to factory implementation was to permit consumers to select the particular head restraint which best suited their needs from among competing brands certified to be in compliance with Federal standards. In short, consumers would choose head restraints as they might choose the color of their car. And, if it were felt that head restraints should be mandatory, then the regulation should simply require installation before delivery.
 
 
 32
 In the second letter APAA also criticized the fact that the lateral widths of the head restraints in the proposed standard were 'designed for averagesized drivers and passengers' and that an 'unusually tall' person would receive neither benefit nor exemption from the need to pay for the head restraint. Petitioner Sterling also wrote a letter at this point in which it characterized these widths as 'not just minimal but very insufficient' in that, if a passenger did not have his seat belt fastened, he might hit his head on the edge of the restraint.[14]
 
 
 33
 In the order promulgating Standard No. 202 (33 Fed.Reg. 2945-46 (1968)), the Administrator responded to several comments received from different parties. The following was directed toward petitioners' submissions:
 
 
 34
 A comment from an equipment manufacturer and an equipment manufacturers' association asserted that the Standard should not require that motor vehicle manufacturers provide head restraints at the time of vehicle manufacture, but that each customer should be free to equip his vehicle with head restraints of his own choice, maintaining that the installation of head restraints is a relatively simple matter and that there appears to be virtually no technological advantage in requiring factory installation. The Administration has determined that safety dictates that head restraints be provided on all passenger cars manufactured on or after January 1, 1969, and that a head restraint standard that merely specified performance requirements for head restraint equipment would not insure that all passenger cars would be so equipped, and would not, therefore, meet the need for safety. Furthermore, the Administration has determined that the performance of a head restraint is dependent upon the strength of the structure of the seat to which it is attached, as well as the compatibility of the head restraint with its anchorage to the seat structure.
 
 
 35
 In response to the petitioners' petition for reconsideration, the Administrator further elaborated his reasons for rejection in a three page letter, dated May 20, 1968. The Administrator first noted the ,'your submissions concede, and indeed strongly champion the safety protection and benefit to the public provided by head restraint devices in vehicles. * * * (but) you would have us make the matter or affording this kind of protection optional with the purchaser of the vehicle in order to preserve a part of your business.' The Administrator stated that he did not have the authority under the Act to require purchasers of vehicles to install equipment, and said that petitioners misconstrued the law if they thought the Act allows the Administrator to establish equipment standards applicable to equipment rather than to vehicles and then 'to require purchasers of vehicles to install such equipment.'
 
 
 36
 The Administrator went on to say that, even if he had the statutory authority to require equipment to be installed by consumers, he would nevertheless deny the petition because of:
 
 
 37
 1. 'the obvious need for a performance standard testing the head restraint in conjunction with the seat structure * * *;' and
 
 
 38
 2. the requirement that the head restraint system also comply with the requirements for protection of the occupants from injury in interior impact under Standard 201.
 
 
 39
 After noting that most of the arguments in the petition for reconsideration had been made earlier, the Administrator stated that:
 
 
 40
 Among the reasons for not adopting the recommendations made in the comments and denying the Petition for Reconsideration are:
 
 
 41
 (1) a head restraint standard promulgated as an equipment standard would not result in all passenger cars being equipped with head restraints on or after the effective date of the standard, but instead would make available head restraints that meet a standard which could be installed in vehicles if vehicle owners, at their option, so desired. This would therefore not meet the need for safety.
 
 
 42
 (2) The performance of a head restraint system is dependent upon the interrelation between the head restraint, the structure of the seat and the seat anchorage.
 
 
 43
 (3) An equipment standard in lieu of a vehicle performance standard would result in a restriction of design that would dictate that head restraints be add-on equipment without allowing other design options such as making the head restraint an integral part of the seat. In addition, it is determined that an earlier effective date of Standard No. 202 would not be reasonable or practicable for Standard No. 202 in its present form; and that a revision of Standard 202 to make such an effective date possible, such as your request that head restraints be optional add-on equipment, would result in a substantial reduction in the protection afforded the public.
 
 
 44
 And, in a paragraph which perhaps best summarizes the Administrator's reasons for rejecting petitioners' position, he wrote:
 
 
 45
 In weighing petitioners' contentions wich regard to Standard No. 202 the public interest was clearly on the side of a vehicle performance requirement which would require the vehicle manufacturer to install the device using any design he might choose to provide a requisite level of protection against whiplash injuries. In issuing the standard this consideration far outweighed the possible economic disadvantage that such a decision might impose on the petitioners and best accomplished the stated purpose and policy of the National Traffic and Highway Safety Act of 1966 'To reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents. (15 U.S.C. 1381.)'
 
 
 46
 The question before us is whether these responses to the objections raised by petitioners adequately reflect, in the language of Section 4, a rational 'consideration of the relevant matter presented' as embodied in 'a concise general statement of (the) basis and purpose' of the Standard under review. We think they do, and that the picture they present is one of conscientious attention to the objections raised to the proposed rule, and their reasoned disposition on the basis of technical information and other relevant considerations which we have no basis for rejecting. The principal elements[15] in the decision to require factory installation appear to have been (1) greater ease of enforcement and consequent assurance of the extension of protection to consumers and (2) the enhancement of protection due to the relationship between the head restraint and the structure of which it is a part. The one seems evident to us as a matter of common experience, while the other is amply supported by expert opinion in the record.[16] The record also supports the reasonableness of the effective date of January 1, 1969, as against petitioners' insistence upon greater haste.[17]
 
 
 47
 For the first time in this court, petitioners change gears and question the contributions of head restraints to the cause of safety. They assert in their brief that:
 
 
 48
 'A considerable amount of evidence and material was submitted in the course of the Administrative proceedings suggesting the a head restraint standard was not needed to protect the public against 'unreasonable risk' of unjury, that head restraints could increase safety hazards for individual drivers and passengers, that any standard with regard to head restraints should continue to make their use optional, and that there was a lack of reliable information with regard to the entire subject matter.'
 
 
 49
 This 'evidence and material' was not, of course, forthcoming from petitioners, since at that time they were busily applauding the Administrator's apparent purpose to impose the blessings of head restraints upon the motoring public, albeit chiding him at the same time for being so slow about it. The sources of this 'evidence and material' were, of course, mainly the motor car manufacturers who tended to greet the proposed rule with controlled rapture and who generally argued that the restraints should be optional and not mandatory.
 
 
 50
 Petitioners now tell us that the Administrator did not, by appropriate findings, deal adequately with these objections, and that, although those who propounded them are not here attacking the Standard, the Standard should be set aside for this reason. This is, to say the least, a soaringly expansive concept of the scope to be afforded on judicial review to a participant in a rule making proceeding. Having urged upon the Administrator the adoption of a mandatory requirement of head restraints because of their contribution to safety, petitioners now tell us to set the order aside because it did not answer the arguments of those who said that the safety aspects were so dubious as to justify, at most, an optional system. We find it hard to take petitioners seriously on this score, despite their effort to analogize themselves to private attorneys general with an unlimited right to expose all dangers to the public interest.
 
 
 51
 In any event, we find substantial support in the record for a conclusion that the contribution of head restraints to consumer safety is such as to warrant their inclusion in all newlymanufactured motor cars. There can be no question but that the Administrator, on the basis of the submissions made to him, could reasonably determine that the benefits from mandatory head restraints far outweighed any disadvantages from such restraints due to decreased visibility, or other possible adverse effects upon safety. On the one hand, the benefits from the reduction of neck injuries in rear-end crashes were clearly identifiable from information and specific data contained in submissions from such independent sources as the Office of Biomechanics Research Center of Wayne State University, and the American Association for Automotive Medicine, as well as a substantial stateistical compilation within the Department. The evidence that head restraints might lead to significant safety disadvantages, on the other hand, seems rather speculative. The Administrator must of necessity consider many variables, and make 'trade-offs' between various desiderata in deciding upon a particular standard for auto safety. On the record before us, we think it clear that Standard no. 202 meets the substantive requirements of the Safety Act.[18]
 
 
 52
 Thus, having appraised all of petitioners' claims against the Standard, we find no occasion to interfere with its operation. Rule makers, as the delegatees of legislative power, are no more likely than their delegators to make everybody happy with a particular exercise of that power. Our function is to see only that the result is reasonable and within the range of authority conveyed, that it has been formulated in the manner prescribed, and that the disappointed have had the opportunity provided by Congress to try to make their views prevail. On all these counts we are satisfied by the record before us. The petitions for review are
 
 
 53
 Denied.
 
 
 
 [1]
 The Safety Act provides that the Secretary of Transportation can issue (1) safety standards for motor rehicles which require that no automobile can be manufactured for sale without meeting the standard (vehicle standard), or (2) safety standards for motor vehicle equipment (equipment standard) which require that all such equipment manufactured for sale must meet that standard. See 15 U.S.C. 1391(2)-(4), and 1397(a) (Supp. III, 1968)
 
 
 [2]
 Petitioners have sued not only the Secretary of Transportation, whose department is now responsible for auto safety standards, but also his two subordinates-- the Federal Highway Administrator and the Director of the National Traffic Safety Bureau. Because Safety Standard No. 202 was issued in the name of the Administrator of the Federal Highway Administration, we shall, for the sake of convenience only, sometimes refer in the body of this opinion to the Administrator as if he were the only respondent whose actions are being challenged. As we note below, however, the allocation of authority under the Act is in fact more complicated, and is disputed in this case
 Petitioners argue the invalidity of Safety Standard No. 202 on the ground that it was issued by the wrong agency of the Department of Transportation because, under Section 115 of the Act, 15 U.S.C. 1404, the Director of the National Traffic safety Bureau, not the Federal Highway Administrator, has the general responsibility for safety standards. Petitioners contend that 'in establishing Safety Standard No. 202' the Safety Bureau and its presidentially appointed director, Dr. William Haddon, Jr., were 'unlawfully bypassed.'
 We find petitioners' contentions to be without merit. First, legislation (49 U.S.C. 1655(a)(6)(a) (Supp. III, 1968)), regulations (49 C.F.R. 1.3(d), 1.4(c) (3)(i) (1968)), and an executive order (Exec.Ord. No. 11,357, 32 Fed.Reg. 8225 (June 8, 1967)) subsequent to the passage of Section 115 of the Act, when taken together, lawfully placed the authority for the issuance of safety standards in the hands of the Federal Highway Administrator, to whom the Director of the Highway Safety Bureau reports directly. The Act vests in the Secretary the power to issue safety standards, 15 U.S.C. 1392(a), and the enabling legislation establishing the Department of Transportation allows the Secretary to delegate authority to his subordinates. (49 U.S.C. 1657(e)(1) (Supp. III, 1968)). Furthermore the Vehicle Safety Act provides that the head of the Safety Bureau 'shall perform such duties as are delegated to him by the Secretary,' 15 U.S.C. 1404 (Supp. III, 1968). Under these circumstances, it seems clear to us that the Secretary could delegate his power to issue standards to the Federal Highway Administrator, and was by no means required to delegate this power to the Director of the Safety Bureau.
 Second, the record before us clearly shows that, under the administrative scheme thus established, Dr. Haddon and his Safety Bureau were in no sense bypassed, but instead had the basic responsibility for gathering the information, holding the conferences with industry representatives, conducting the research, and finally writing the reports on which, the Standard in issue was based.
 
 
 [3]
 5 U.S.C. 551-559, 701-706 (Supp. III, 1968). Section 4(b) of the APA provides:
 'After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title (APA 7, 8) apply instead of this subsection.' 5 U.S.C. 553(c).
 
 
 [4]
 Under formal rule making, a party by virtue of Section 7 of the APA has 'the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts.' 5 U.S.C. 556(d) (Supp. III, 1968). Furthermore, there must be a transcript of all testimony, APA 7(d), 5 U.S.C. 556(e) (Supp. III, 1968); and the decision must include 'a statement of-- (a) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; and (b) the appropriate rule, order, sanction, relief, or denial thereof.' APA 8(b), 5 U.S.C. 557(c) (Supp. III, 1968). Although they do not apply to all rule making, sections 7 and 8 do apply to APA adjudications
 
 
 [5]
 The one procedural issue which the petitioners did raise at the administrative level, and again press here, is that the National Motor Vehicle Safety Advisory Council does not contain 'adequate representation of the automobile aftermarket equipment industry.' Under the Act, the Secretary is, before issuing safety standards, required to consult with this Council, and with the Vehicle Equipment Safety Commission. 15 U.S.C. 1392(f)(2), 1393(b) (Supp. III, 1968). Petitioners also claim that the Secretary failed to consult with either the Commission or the Council. The record clearly indicates, however, that both the Council and commission were consulted before the issuance of the Standard. It further appears that the only mandatory membership requirement on the Council imposed by Section 1393 of the Act is that the Secretary appoint a majority as 'representatives of the general public.' Although the remainder of the Council is to be composed of representatives of various enumerated automotive interests, we think that the statute, when read in light of its legislative history, does not compel the Secretary to appoint representatives from each of those interest groups. See H.Rep.No. 1919, 89th Cong., 2d Sess. 17 (1966) (the Secretary has 'full discretion in determining the makeup of the Council'); 112 Cong.Rec. 20460-61 (daily ed. August 18, 1966) (remark of Rep. Rogers that: 'We have suggested in the legislation the other areas from which the appointments will come * * * but left it to the discretion of the Secretary since it is an advisory committee * * *.')
 
 
 [6]
 Petitioners also argue that the use of the word 'order' in the Safety Act implies that adjudicatory, not rule making, procedures are necessary. Section 103(a), 15 U.S.C. 1392(a) (Supp. III, 1968), says that the Secretary 'shall establish by order appropriate Federal motor vehicle safety standards,' and Section 103 (b), 15 U.S.C. 1392(b) (Supp. III, 1968), makes the APA applicable to all such 'orders.' Petitioners, turning to the APA for its definition of 'order,' triumphantly discover that Section 2 of the APA characterizes an 'order' as 'the whole or part of a final disposition of an agency in any matter other than rule making,' and defines 'adjudication' as the 'agency process for the formation of an order.' From this petitioners conclude that any action taken by 'order' must issue from a formal proceeding consonant with the requirements of Sections 7 and 8
 Petitioners' argument is without merit, however, because quite apart from the descriptive label used in the Safety Act, a safety standard is clearly a 'rule' for purposes of the APA. The Administrative Procedure Act in Section 2(c) defines a 'rule' as 'the whole or part of any agency statement of general or particular applicability and future effect * * *.' This is, obviously, a formulation which is precisely descriptive of motor car safety standards, for the Safety Act clearly contemplates that they lay down commandments of general applicability for future observance. Section 103(c), 15 U.S.C. 1392(c) (Supp. III, 1968) (standard ordinarily to take effect no 'sooner than one hundred eighty days' after issuance).
 
 
 [7]
 See note 4 supra
 
 
 [8]
 15 U.S.C. 1394 (Supp. III, 1968)
 
 
 [9]
 15 U.S.C. 1394(a)(3) (Supp. III, 1968) provides:
 Upon the filing of the petition referred to in paragraph (1) of this subsection, the court shall have jurisdiction to review the order in accordance with section 1009 of Title 5 (APA 10, now 5 U.S.C. 701-706 (Supp. III, 1968)) and to grant appropriate relief as provided in such section.
 
 
 [10]
 5 U.S.C. 706 (Supp. III, 1968), which provides: To the extent necessary to dicision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
 (1) compel agency action unlawfully withheld or unreasonably delayed; and
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 (D) without observance of procedure required by law;
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title (APA 7, 8) or otherwise reviewed on the record of an agency hearing provided by statute; or
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
 In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
 
 
 [11]
 5 U.S.C. 706(2)(e) (Supp. III. 1968)
 
 
 [12]
 The statement in the text of the standard simply stated:
 This standard specifies requirements for head restraints to reduce the frequency and severity of neck injury in rear-end and other collisions.
 
 
 [33]
 Fed.Reg. 2916 (1968)
 The reasoning of the Administrator's denial of rehearing is discussed at length in the second part of this opinion. That a court may consider the statement of an agency in denying a request for rehearing in deciding whether the requirements of APA 4(b) have been met is shown by Logansport Broadcasting Corp. v. United States, 93 U.S.App.D.C. 342, 345-346, 210 F.2d 24, 27-28 (1954).
 
 
 [13]
 See note 1, supra
 
 
 [14]
 The Sterling letter also supported the APAA position generally, and protested that it was 'ridiculous' to delay implementation of a standard until January 1, 1970, as was originally proposed. In this latter connection, petitioner Sterling had the following to say about the advantages of head restraints:
 It has been well established that head restraints will minimize and, in many cases, prevent whiplash injury to drivers and front seat occupants of the over 90,000,000 vehicles on our highways and streets. By writing the law to allow the head restraints to be supplied by the aftermarket, this protection could by afforded our motorists much sooner.
 
 
 [15]
 As noted above, the Administrator also claimed that he had no authority under the Act to establish an equipment standard, and then to make mandatory the installation of such equipment on all cars. Although the Safety Act does seem to contemplate that the primary responsibility for safe motor vehicles would be placed upon sutomobile manufacturers, see 15 U.S.C. 1397(a)(1), 1403 (Supp. III, 1968), we do not find it necessary in the context of this case to deal with the Administrator's interpretation; the other reasons advanced by the Administrator for adopting a vehicle rather than an equipment standard are amply adequate
 
 
 [16]
 See, e.g., Severy, Brink, & Baird, Backrest and Head Restraint Design for Rearend Collision Protection, UCLA Institute of Transportation and Traffic Engineering (1968)
 
 
 [17]
 Several automobile manufacturers had claimed they could not meet an earlier effective date, and had requested that the standard be made optional until September, 1969
 
 
 [18]
 Section 103 of the Vehicle Safety Act provides:
 (a) * * * Each such Federal motor vehicle safety standard shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms.
 (f) In prescribing standards under this section, the Secretary shall (1) consider relevant available motor vehicle safety data, including the results of research, development, testing and evaluation activities conducted pursuant to this chapter; (2) consult with the Vehicle Equipment Safety Commission, and such other state or interstate agencies (including legislative committees) as he deems appropriate; (3) consider whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed; and (4) consider the extent to which such standards will contribute to carrying out the purposes of this chapter.
 15 U.S.C. 1392(a), (f) (Supp. III, 1968).