**Slip Op. 26-68**

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| YDD CORPORATION LLP,<br><br>    Plaintiff,<br><br>and<br><br>TNC KAZCHROME JSC,<br><br>    Consolidated Plaintiff,<br>v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>and<br><br>CC METALS AND ALLOYS, LLC<br>AND FERROGLOB USA, INC.,<br><br>    Defendant-Intervenors. | Before: Jennifer Choe-Groves,<br>        Judge<br><br>Consol. Court No. 25-00100 |

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's final determination in the 2023 antidumping investigation of ferrosilicon from the Republic of Kazakhstan.]

Dated: June 23, 2026

Matthew J. McConkey, Mayer Brown LLP, of Washington, D.C., argued for Plaintiff YDD Corporation, LLP. With him on the brief was Ryan R. Migeed.

Nathaniel J. Halvorson, Baker & McKenzie LLP, of Washington, D.C., argued for Consolidated Plaintiff TNC Kazchrome JSC. On the brief was Christine M. Streatfeild.

Claudia Burke, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the brief were Brett A. Shumate, Assistant Attorney General, and Patricia M. McCarthy, Director. Of counsel on the brief was Brian Stonebreaker, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C. Emma E. Bond, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., and Alyson K. Finley, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C. also appeared.

Adam H. Gordon and Scott D. McBride, The Bristol Group PLLC, of Washington D.C., argued for Defendant-Intervenors CC Metals and Alloys, LLC, and Ferroglobe USA, Inc. With them on the brief was Benjamin J. Bay.

Choe-Groves, Judge: This action concerns the U.S. Department of Commerce's ("Commerce") final determination in the antidumping duty investigation of ferrosilicon from the Republic of Kazakhstan ("Kazakhstan"). Ferrosilicon From Kazakhstan ("Final Determination"), 90 Fed. Reg. 14,077 (Dep't of Commerce Mar. 28, 2025) (final affirmative determination of sales at less-than-fair-value and final negative determination of critical circumstances) and accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Ferrosilicon from Kazakhstan (Mar. 21, 2025) ("Final IDM"), PR 272;[1] see also Ferrosilicon From

---

[1] Citations to the administrative record reflect the public record ("PR") and confidential record ("CR") numbers filed in this case, ECF Nos. 54, 55.

Malaysia, 90 Fed. Reg. 21,456 (Dep't of Commerce May 20, 2025) (amended final determination of sales at less than fair value; ferrosilicon from Brazil, Kazakhstan, and Malaysia: antidumping duty orders).

Before the Court are two Rule 56.2 motions for judgment on the agency record filed by Plaintiff YDD Corporation, LLP and Consolidated Plaintiff TNC Kazchrome JSC.  Plaintiff YDD Corporation, LLP ("Plaintiff" or "YDD") filed a Rule 56.2 motion for judgment on the agency record that raises four issues: (1) whether Commerce's inclusion of sales that were destined for Canada in its calculation of YDD's dumping margin was supported by substantial evidence and in accordance with law; (2) whether Commerce's application of partial adverse facts available ("AFA") in calculating YDD's dumping margin was supported by substantial evidence and in accordance with law; (3) whether Commerce's application of zeroing was supported by substantial evidence and in accordance with law; and (4) whether Commerce's calculation of the portion of YDD's dumping margin based on partial AFA was supported by substantial evidence and in accordance with law.  Pl. YDD Corp. LLP's R. 56.2 Mot. J. Agency R. ("YDD's Br.") at 2–3, ECF Nos. 32, 33.

Consolidated Plaintiff TNC Kazchrome JSC's ("Consolidated Plaintiff" or "Kazchrome") filed a Rule 56.2 motion for judgment on the agency record that challenges Commerce's selection of the shipment date as the date of sale for

Kazchrome's United States sales.  Consol. Pl. Kazchrome's R. 56.2 Mot. J. Agency R., ECF Nos. 30, 31; see Consol. Pl's R. 56.2 Mem. Law Supp. Mot. J. Agency R. ("Kazchrome's Br."), ECF Nos. 30-1, 31-1.

The Court held oral argument on May 5, 2026.  Order (Dec. 23, 2025), ECF No. 35.  For the reasons discussed below, the Court remands Commerce's Final Determination.

## BACKGROUND

In April 2024, Commerce initiated antidumping investigations of ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia.  Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian Federation, 89 Fed. Reg. 31,137 (Dep't of Commerce Apr. 24, 2024) (initiation of less-than-fair-value investigations).  Commerce selected YDD and Kazchrome as respondents.  Mem. from Mira Warrier, International Trade Compliance Analyst, AD/CVD Operations, to The File, entitled "Respondent Identification" (May 8, 2024), PR 32; Mem. from Minoo Hatten, Director, AD/CVD Operations, to James Maeder, Deputy Ass't Sec'y, AD/CVD Operations, regarding "Respondent Identification Mem. – Clarification" (June 10, 2024), PR 55.

On November 6, 2024, Commerce published the preliminary determination of its investigation.  Ferrosilicon From Kazakhstan, 89 Fed. Reg. 88,007 (Dep't Commerce Nov. 6, 2024) (preliminary affirmative determination of sales at less

than fair value, preliminary negative determination of critical circumstances, postponement of final determination, and extension of provisional measures) and accompanying Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Ferrosilicon from Kazakhstan (Dep't Commerce Oct. 31, 2024) ("PDM"), PR 184.

Commerce issued the Final IDM on March 21, 2025, and published its Final Determination on March 25, 2025. Final IDM; Final Determination, 90 Fed. Reg. 14,077. Commerce continued to regard YDD's sales to a certain United States customer as sales in the United States and continued to apply partial AFA to YDD's relationship with that customer. Final IDM at 28–32. Commerce maintained that it made an appropriate methodological choice in setting negative margins calculated under the average-to-average methodology to zero in its calculation of the overall weighted-average margin for YDD. Id. at 32–33. With regard to Kazchrome, Commerce continued to determine that the shipment date was the proper date of sale for Kazchrome's sales in the United States and that the record information did not support the use of the final invoice date or title transfer date as the date of sale. Id. at 5–7.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).

The Court will hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

**I.      YDD's Rule 56.2 Motion**

**A.      Commerce's Inclusion of Canadian Sales Data in YDD's Dumping Margin**

YDD argues that Commerce disregarded record evidence and ignored prior practice to determine that sales destined for Canada were to be included in the United States sales used to calculate YDD's dumping margin. YDD's Br. at 13–21. YDD contends that Commerce's longstanding practice is to exclude from the calculation subject merchandise that enters the United States for consumption, but is not sold in the United States. Id. at 14. YDD asserts that sales that are destined for other markets after importation into the United States should be excluded. Id. YDD avers that Commerce ignored the agency's own "knowledge test" by disregarding evidence from YDD that sales to a certain customer were imported into the United States, but destined ultimately for the Canadian market. Id. at 15–21.

Defendant United States ("Defendant") and Defendant-Intervenors CC Metals and Alloys, LLC and Ferroglobe USA, Inc. (collectively, "Defendant-Intervenors") argue that the documentation at entry did not indicate that the

merchandise would be sold outside of the United States. Def.'s Resp. Pls.' R. 56.2

Mots. J. Agency R. ("Def.'s Resp. Br.") at 12–14, ECF Nos. 40, 43; Def.-Intervs.'

Opp'n R. 56.2 Mots. ("Def.-Intervs.' Resp. Br.") at 16–24, ECF Nos. 44, 45.

Defendant and Defendant-Intervenors contend that YDD did not offer any

documentation that would have satisfied Commerce's "knowledge test," or

permitted Commerce to exclude the sales to YDD's customer in its calculation of

the dumping margin. Def.'s Resp. Br. at 13–14; Def-Intervs.' Resp. Br. at 17–24.

In antidumping investigations, Commerce calculates a dumping margin,

which is the "amount by which the normal value exceeds the export price[.]" 19

U.S.C. § 1673. The term "export price" is defined as:

> [T]he price at which the subject merchandise is first sold (or agreed to
> be sold) before the date of importation by the producer or exporter of
> the subject merchandise outside of the United States to an unaffiliated
> purchaser in the United States or to an unaffiliated purchaser for
> exportation to the United States, as adjusted under subsection (c).

19 U.S.C. § 1677a(a). The term "normal value" is defined under the following

subsection of the statute:

> [T]he price at which the foreign like product is first sold (or, in the
> absence of a sale, offered for sale) for consumption in the exporting
> country, in the usual commercial quantities and in the ordinary course
> of trade and, to the extent practicable, at the same level of trade as the
> export price or constructed export price[.]

19 U.S.C. § 1677b(a)(1)(B)(i). Thus, Commerce compares the price at which the subject merchandise is sold in the exporting country to the price at which the subject merchandise is first sold for export to the United States.

There is no basis for Commerce to assess antidumping duties on imports to the United States that are subsequently re-exported without a sale occurring in the United States. Torrington Co. v. United States, 17 CIT 199, 212, 818 F. Supp. 1563, 1574 (1993), aff'd, 82 F.3d 1039 (Fed. Cir. 1996) ("[I]t is impossible to meet the statutory requirement that, in order to assess antidumping duties, a U.S. industry must be injured by imports if these imports are never sold in the U.S. market."). To determine whether to exclude sales destined for other markets after importation into the United States from the dumping margin calculation, Commerce utilizes a "knowledge test" under 19 U.S.C. § 1677a to determine whether a producer knew, or should have known, at the time of a sale that the subject merchandise would be exported. Allegheny Ludlum Corp. v. United States, 24 CIT 1424, 1433, 215 F. Supp. 2d 1322, 1331 (2000) (citing Yue Pak, Ltd. v. United States ITA, 20 CIT 495 (1996), aff'd, 111 F.3d 142 (Fed. Cir. 1997)). In a prior investigation, Commerce described its knowledge test as follows:

> Commerce's test for determining knowledge regarding the destination of merchandise is to consider whether the relevant party knew, or should have known, that the merchandise was destined for a different market. In determining whether a party knew, or should have known,

the destination of merchandise, Commerce's well-established practice is to consider such factors as: whether that party prepared or signed any certificates, shipping documents, contracts or other papers stating the destination of the merchandise; whether that party used any packaging or labeling which stated the destination; whether any unique features or specifications of the merchandise otherwise indicated the destination; and whether that party admitted to Commerce that it knew that its shipments were destined for a particular market.

Final IDM at 30 (citing Tin Mill Products from the Netherlands, 89 Fed. Reg. 1524 (Dep't Commerce Jan. 10, 2024) (Final negative determination of sales at less than fair value) and accompanying Issues and Decision Memorandum ("Tin Mill IDM") at Cmt. 2); see also Certain Lined Paper Products from India, 88 Fed. Reg. 21,971 (Dep't Commerce Apr. 12, 2023) (final results of antidumping duty administrative review and final determination of no shipments; 2020-2021) and accompanying Issues and Decision Memorandum at Cmt.1; Certain Circular Welded Non-Alloy Steel Pipe from Mexico, 76 Fed. Reg. 36,086 (Dep't Commerce June 21, 2011) (final results of antidumping duty administrative review) and accompanying Issues and Decision Memorandum at Cmt. 1.

During the investigation, YDD stated in an initial questionnaire to Commerce that YDD's United States sales to a particular United States customer "were intended to be transshipped to the Canadian market." Letter from Mayer Brown LLP, to U.S. Dep't Commerce, entitled "YDD Corporation LLP—Section A Questionnaire Response" (July 10, 2024) ("YDD AQR") at 15–16, PR 78, CR 52-77. YDD provided a contract with the United States customer indicating that

certain sales delivered to the United States were destined for Canada. YDD AQR at Ex. A-8 (also including a purchase order stating that the consignee of the merchandise was a Canadian customer and the final destination of the merchandise was Canada). YDD also provided an explanation of how it distinguished sales destined for the Canadian market in its sales database. Letter from Mayer Brown LLP, to U.S. Dep't of Commerce, entitled "YDD Corporation LLP—Section C Questionnaire Response" (July 31, 2024) at C-19–C-20, PR 87, CR 78.

Commerce requested in a supplemental questionnaire that YDD provide the total quantity and value of merchandise stored by YDD's United States customer at the United States warehouse before being shipped to Canada. Letter from Mayer Brown LLP, to U.S. Dep't of Commerce, entitled "YDD Corporation LLP—Response to Supplemental Questionnaire" (Sept. 16, 2024) at 12, PR 123, CR 189-214. YDD responded that it did not have information on the operations of its United States customer, but provided a letter signed by the customer that stated that the "full quantity" of merchandise stored in the warehouse would be shipped to a Canadian customer, pursuant to a contract between YDD's customer and the Canadian customer. Id.; id. at Ex. S1-6.1 ("YDD Customer Letter"). YDD also provided a movement schedule that indicated the quantity of YDD sales that had entered the warehouse, the quantity that had shipped to Canada as of the date of the

letter, and the quantity that remained in the warehouse as of the date of the letter. Id. at Ex. S1-6.2.

In the Final IDM, Commerce explained that to determine whether a United States sale should be included in the margin calculation, it considered whether the unaffiliated customer was located in the United States, whether the merchandise was delivered in the United States, and whether the goods entered for consumption. Final IDM at 29 (citing 19 U.S.C. § 1677a(a)). Commerce described its knowledge test by reciting the description in the Tin Mill IDM. Id. at 30 (citing Tin Mill IDM at Cmt. 2). Commerce continued to determine that YDD's merchandise was shipped to YDD's United States customer's warehouse in the United States, and entered for consumption in the United States. Id. at 29–30 (citing YDD AQR at 15–16). Commerce explained that "international freight invoices" indicated to Commerce that the United States was the destination for the subject merchandise. Id. at 30. Commerce stated that YDD's customer did not provide signed documentation, certificates, or contracts that showed that the final destination of the merchandise was Canada. Id.

Although Commerce explained that its determination that YDD's sales to its United States customer were destined for the United States relied on evidence of "international freight invoices," the Final IDM cited to no such evidence to support that determination. Commerce also stated that it examined YDD's initial

questionnaire response to determine that the subject merchandise was entered for

consumption and shipped to YDD's United States customer's warehouse in the

United States, but Commerce did not explain why it disregarded other contrary

record evidence, including documents containing the remaining portion of YDD's

response that described YDD's understanding that the merchandise was intended

to be transshipped to Canada.  See id.; YDD AQR at 15–16.

In addition to failing to cite supporting record evidence for its determination,

Commerce overlooked record evidence that appears to contradict its determination.

In the Final IDM, Commerce did not mention the purchase order that YDD placed

on the record, or explain whether this document indicated sufficiently that YDD

had knowledge that the merchandise was destined for a different market outside of

the United States.  See YDD AQR at Ex. A-8.  Commerce stated that there were no

signed documents, certificates, or contracts that indicated that the final destination

of the merchandise was Canada, but this determination failed to address the letter

on the record signed by YDD's customer that suggested that the entirety of the

subject merchandise would be shipped to a Canadian customer.  See id.; YDD

Customer Letter.

Commerce failed to support its determination with substantial evidence and

failed to address contrary record evidence.  The Final IDM was devoid of any

explanation as to why the documentation that YDD submitted to Commerce did

not meet the "certificates, shipping documents, contracts or other papers stating the destination of the merchandise" factor of Commerce's knowledge test.  See Tin Mill IDM at Cmt. 2.

During oral argument, the Government attempted to explain why the record evidence provided by YDD was imprecise and unreliable, such that Commerce could not determine that the final destination of the merchandise was Canada.  Oral Arg. Rec. at 16:00–20:32.  However, post-hoc explanations by Defendant at oral argument cannot cure the lack of explanation by Commerce in the Final IDM.  See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

Defendant acknowledged the lack of citations to evidentiary support in the Final IDM, but argued during oral argument that the international freight invoices were available on the record and the Court could have located them, examined them, and discerned why Commerce determined that the documents established that the merchandise was destined for the United States.  Oral Arg. Rec. at 10:43–21:14.  Such arguments are unpersuasive, and this Court has emphasized previously that "it is not the Court's responsibility to sift through the record to attempt to identify which documents, if any, support Commerce's determinations." Jiangsu Senmao Bamboo and Wood Industry Co. v. United States, 47 CIT __, __,

651 F. Supp. 3d 1348, 1358 (2023).  The Court will not "undertake a 'laborious examination of the record, formulate in the first instance the significant issues faced by the agency and articulate the rationale of their resolution.'"  In re Section 301 Cases, 46 CIT __, __, 570 F. Supp. 3d 1306, 1338 (2022) (quoting Auto. Parts & Accessories Ass'n v. Boyd, 407 F.2d 330, 338 (D.C. Cir. 1968)).  Accordingly, "conclusory statements that do not explain how a determination was reached are therefore insufficient."  Id.

Because Commerce failed to cite any record evidence to support its determination that certain sales by YDD should be included in the dumping margin calculation, and failed to explain why other contrary record evidence was insufficient, the Court holds that Commerce's determination was not in accordance with law and not supported by substantial evidence.  The Court remands this issue for further review and explanation consistent with this Opinion.

### B.    Commerce's Application of Adverse Facts Available

YDD argues that Commerce's application of partial AFA to determine that YDD withheld information regarding an affiliation with a particular customer was not in accordance with law or supported by substantial evidence.  YDD's Br. at 21–33.

Because the Court is remanding Commerce's determination of whether YDD's sales to a United States customer were destined for the Canadian market,

and Commerce's application of AFA concerned that same customer, the Court defers its examination of the AFA issue because Commerce must re-evaluate whether YDD's sales to the customer were relevant to the investigation and should be included in the dumping margin calculation. Commerce should reconsider these issues as appropriate on remand.

### C.      Commerce's Application of Zeroing

YDD argues that Commerce departed from its long-established practice of not using zeroing for antidumping investigations in which it uses the "average-to-average" sales comparison methodology. YDD Br. at 33–38.

Because Commerce's dumping margin calculation was impacted by its determination regarding YDD's sales to a particular customer, and the Court is remanding the issue of whether that customer's sales should have been considered in the investigation, the Court does not reach the issue of how Commerce calculated the dumping margin. Commerce should reconsider these issues as appropriate on remand.

### D.      Commerce's Calculation of the Partial AFA Portion of YDD's Final Antidumping Duty Margin

YDD argues that Commerce did not calculate the partial AFA portion of YDD's final weighted-average dumping margin properly. YDD's Br. at 38–42.

Because the Court remands Commerce's determination regarding YDD's sales to a United States customer, and defers ruling on Commerce's subsequent

AFA determination, the Court also defers ruling on Commerce's calculation of the partial AFA portion of YDD's final weighted-average dumping margin at this time.

## II.    Kazchrome's Rule 56.2 Motion

Kazchrome argues that Commerce ignored and contradicted record evidence when it selected the shipment date, rather than the invoice date, as the date of sale for Kazchrome's sales to its only United States customer, TELF AG ("TELF"). Kazchrome's Br. at 17–23.  Kazchrome contends that there was record evidence indicating that the final sale price was not established until Kazchrome accepted TELF's pricing schedule and issued the final invoice.  Id. at 18–19.  Defendant and Defendant-Intervenors argue that Commerce's decision to use Kazchrome's shipment date as the date of sale was consistent with Commerce's practice and the applicable statute.  Def.'s Resp. Br. at 30–33; Def.-Intervs.' Resp. Br. at 37–46. Defendant and Defendant-Intervenors aver that Commerce's regulations establish a presumption that the date of sale is the invoice date, but longstanding practices permit the use of the shipment date when shipment precedes invoicing and the record does not show that material terms were subject to change after shipment. Def.'s Resp. Br. at 32–33; Def.-Interv.'s Resp. Br. at 39–45.

Commerce must conduct a "fair comparison" of normal value and export price in determining whether merchandise is being, or is likely to be, sold at less

than fair value.  See 19 U.S.C. § 1677b(a); see also Smith-Corona Grp. v. United

States, 713 F.2d 1568, 1578 (Fed. Cir. 1983).  Normal value must be from "a time

reasonably corresponding to the time of sale used to determine the export price or

constructed export price[.]"  19 U.S.C. § 1677b(a)(1)(A).  Commerce has

promulgated the following regulation regarding the date that should be used as the

date of sale for purposes of comparing normal value and export price:

> In identifying the date of sale of the subject merchandise or foreign like product, [Commerce] *normally will use the date of invoice*, as recorded in the exporter or producer's records kept in the ordinary course of business.  However, [Commerce] *may use a date other than the date of invoice* if [Commerce] is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

19 C.F.R. § 351.401(i) (emphasis added).  The United States Court of International

Trade has held previously that the material terms of a sale generally include the

price, quantity, and payment terms.  See USEC Inc. v. United States, 31 CIT 1049,

1055, 498 F. Supp. 2d 1337, 1344–45 (2007).  The important factor to determine is

when the parties have reached a "meeting of the minds."  Nucor Corp. v. United

States, 33 CIT 207, 249, 612 F. Supp. 2d 1264, 1300 (2009).

In promulgating the implementing regulation, Commerce explained that "as

a matter of commercial reality, the date on which the terms of a sale are first

agreed is not necessarily the date on which those terms are finally established"

because "price and quantity are often subject to continued negotiation between the

buyer and the seller until a sale is invoiced." Antidumping Duties; Countervailing

Duties, 62 Fed. Reg. 27,296, 27,348 (Dep't Commerce May 19, 1997). "[A]bsent

satisfactory evidence that the terms of sale were finally established on a different

date, the Department will presume that the date of sale is the date of invoice . . . .

If the Department is presented with satisfactory evidence that the material terms of

sale are finally established on a date other than the date of invoice, the Department

will use that alternative date as the date of sale." Id. at 27,349. Commerce will

rely on the date provided on the invoice "as recorded in a firm's records kept in the

ordinary course of business[.]" Id. at 27,348. Rather than determine the date of

sale for each sale, Commerce prefers to use a single and uniform source for the

date of sale for each respondent. Id. The party seeking a date other than the

invoice date bears the burden of presenting Commerce with sufficient evidence

demonstrating that "another date . . . 'better reflects the date on which the exporter

or producer establishes the material terms of sale.'" Viraj Grp., Ltd. v. United

States, 343 F.3d 1371, 1377 n.1 (Fed. Cir. 2003) (citing 19 C.F.R. § 351.401(1)).

During the investigation, Commerce issued questionnaires that required

Kazchrome to report the date of sale for home market sales and United States

market sales. In its initial questionnaire response, Kazchrome reported the

shipment date as the date of sale. Letter from Baker McKenzie LLP, to U.S. Dep't

of Commerce, entitled "Kazchrome's Sections B and C Initial Questionnaire

Responses" (Aug. 5, 2024) ("Kazchrome's BCQR") at B-18–B-19, PR 89-90, CR 103-111. Kazchrome revised the reported field for the date of sale in its supplemental questionnaire response and reported that the date of sale should be the final invoice date. Letter from Baker McKenzie LLP, to U.S. Dep't of Commerce, entitled, "Kazchrome's Second Section A-C Supplemental Questionnaire Response" (Oct. 9, 2024) ("Kazchrome's A-C SQR2") at 1, PR 150, CR 250-253.

In its responses to Commerce, Kazchrome represented that all of its sales to the United States market during the period of investigation were through TELF. Letter from Baker McKenzie LLP, to U.S. Dep't of Commerce, entitled, "Kazchrome's Section A Questionnaire Response" (July 8, 2024) ("Kazchrome's AQR") at 19, 20, PR 70-76, CR 40-51. Kazchrome explained that pursuant to the contract that it had with TELF, Kazchrome issued provisional and final invoices to TELF. Id.; Kazchrome's BCQR at C-16, C-18–C-19. The provisional invoice included an estimated sales price for which TELF would pay a portion after the merchandise shipped, and the final invoice included an amount that was the balance between the final price and the amount of the provisional invoice price that was already paid. Kazchrome's BCQR at C-18–C-19; Kazchrome's AQR at 22. After the merchandise was shipped and TELF paid a portion of the provisional invoice, TELF issued a notice of title transfer and sent a pricing schedule to

Kazchrome, which prompted Kazchrome to issue a final invoice with the final price if the Parties did not need to renegotiate it.  Mem. From Mira Warrier, Int'l Trade Compliance Analyst, and Brittany Bauer, Sr. Int'l Trade Compliance Analyst, to The File, regarding "Verification of the Sales Response of TNC Kazchrome JSC in the Less-Than-Fair-Value Investigation of Ferrosilicon from Kazakhstan" (Dec. 23, 2024) ("Kazchrome Sales Verification Report"), at 5–7, PR 227, CR 482; Letter from Baker McKenzie LLP, to U.S. Dep't of Commerce, entitled, "Kazchrome's Response to the Department's October 16, 2024 Memorandum" (Oct. 16, 2024) ("Kazchrome's October 16 Submission") at Attachment I, PR 158, CR 259 (noting TELF and Kazchrome's ability to negotiate the final price if a party objected to the pricing schedule).

The final invoice price could differ from the provisional invoice price due to adjustment factors that had to be considered as the sale and shipment progressed, such as insurance and financing expenses.  Kazchrome's AQR at 22; Kazchrome's October 16 Submission at Attachment I.  Kazchrome provided Commerce with its sales reconciliation, which reflected the difference between the provisional invoice total revenue amount and the final invoice total revenue amount.  See Kazchrome's BCQR at Ex. B-4; Letter from Baker McKenzie LLP, to U.S. Dep't of Commerce, entitled, "Kazchrome's Section A-C Supplemental Questionnaire Response" (Sept. 16, 2024) ("Kazchrome's A-C SQR1") at Ex. B-4 (revised), PR 122, CR 179-188;

Letter from Baker McKenzie LLP, to U.S. Dep't of Commerce, entitled, "Kazchrome's Third Sections A-C Supplemental Questionnaire Response" (Oct. 24, 2024) ("Kazchrome's A-C SQR3") at Ex. B-4 (Revised 2), PR 175, CR 319-324.

In the Final IDM, Commerce continued to determine that the appropriate date of sale was the shipment date.  Final IDM at 6–7.  Commerce explained that its longstanding practice "is to apply the earlier of the shipment date or invoice date as the date on which all material terms of sale are set, unless there are sufficient record facts to merit departing from this general rule."  Id. at 6.  Commerce acknowledged that Kazchrome had reported in a supplemental questionnaire that the date of sale should be the final invoice date.  Id. at 6–7 (citing Kazchrome's BCQR at B-18–B-19; Kazchrome's A-C SQR2 at 1).  Commerce maintained that "based on record evidence . . . the material terms of sale for Kazchrome's [United States] sales were set prior to the final invoice," and Commerce continued to use the shipment date as the date of sales for Kazchrome's United State sales.  Id. at 7 (citing PDM at 15).  Commerce rejected Kazchrome's arguments regarding the title transfer date, because Commerce determined that there were "no supporting documents to appropriately support the title transfer dates and no reported dates of title transfer within the [United States] sales database."  Id. (citing Kazchrome's BCQR at Ex. B-4 and noting the revised

iterations of the exhibits provided in Kazchrome's A-C SQR1 and Kazchrome's A-C SQR3).

Notwithstanding Commerce's assertion that its practice is to use the earlier of the shipment date or the invoice date, the plain language of the regulation states that Commerce "normally will use the date of invoice" as the date of sale, and may select an alternate date only if Commerce is satisfied that the alternate date better reflects when the material terms were set.  19 C.F.R. § 351.401(i).  In the Final IDM, Commerce cited to the PDM to support its assertion that the material terms of sale for Kazchrome's sales to TELF were set prior to the final invoice.  Final IDM at 7 (citing PDM at 15) ("We examined the information on the record and preliminar[ily] find that the material terms of sale of Kazchrome's [United States] sales were set prior to the final invoice.").  The PDM's sole citation for this determination was a preliminary calculation memorandum that contained "the details of Kazchrome's accurate date of sale for its [United States] sales."  PDM at 15 (citing Mem. from Samantha Kinney, Sr. Int'l Trade Compliance Analyst, to The File, regarding "Preliminary Determination Margin Calculation for TNC Kazchrome J.S.C." (Oct. 31, 2024) ("Preliminary Calculation Memorandum"), PR 186, CR 331).

The Preliminary Calculation Memorandum referenced a "long-term sales agreement" (that was not identified in a citation to the record), with a statement

that the final price is set on the date of title transfer. Preliminary Calculation Memorandum at 3. Commerce explained that because Kazchrome did not report the transfer title date for its United States sales and the related information was not on the record, Commerce determined that the earlier of the invoice date or shipment date would be appropriate and selected the shipment date as the date of sale. Id. Commerce did not explain why the shipment date "better reflects the date on which the exporter or producer establishes the material terms of sale." Id.; 19 C.F.R. § 351.401(i). The Court concludes that Commerce did not provide an adequate explanation for its decision to rely on a date of sale other than the date of invoice, and did not support its determination with record evidence.

In the Final IDM, Commerce also stated two reasons for its rejection of the petitioners' suggestion to use the title transfer date: (1) the record had "no supporting documents to appropriately support the title transfer dates and no reported dates of title transfer within the [United States];" and (2) Kazchrome did not argue in its case brief that Commerce should have used the title transfer date as the date of sale. Final IDM at 7.

Commerce explained that Kazchrome's sales reconciliation did not support a determination that the date of title transfer was the sale date because there were no supporting documents and the title transfer dates were not included in Kachrome's United States sales database. Final IDM at 7 (citing Kazchrome's BCQR at Ex. B-

4 and noting the revised iterations, Kazchrome's A-C SQR1 at Ex. B-4 (revised); Kazchrome's A-C SQR3 at Ex. B-4 (Revised 2)). The Court observes that Kazchrome's sales reconciliation revealed a difference between the provisional invoice total revenue amount and the final invoice total revenue amount. See Kazchrome's BCQR at Ex. B-4; Kazchrome's A-C SQR1 at Ex. B-4 (revised); Kazchrome's A-C SQR3 at Ex. B-4 (Revised 2). Price and quantity are "material terms," and the discrepancy between the provisional and final invoice amounts in Kazchrome's sales reconciliation suggests that the Parties had not reached a "meeting of the minds" as of the shipment date. See USEC Inc., 31 CIT at 1055, 498 F. Supp. 2d at 1344–45; Nucor Corp., 33 CIT at 249, 612 F. Supp. 2d at 1300. The Court notes, however, that Kazchrome's sales reconciliation was not the only evidence on the record that was provided to support the title transfer dates. For example, Exhibit SVE-4 of Kazchrome's Sales Verification Exhibits provided a number of documents marked "Notice of Transfer of Ownership" that provided a "Date of Title Transfer." Kazchrome's Sales Verification Exhibits at Ex. SVE-4. The Final IDM did not state whether Commerce considered this documentation or why it was considered inadequate. See Final IDM at 7. Commerce thus failed to address potentially contrary evidence on the record in its analysis.

Commerce also stated that Kazchrome's case brief did not request the use of the title transfer date as an alternative to the final invoice date, but this assertion is

contradicted by the record.  For example, Kazchrome's case brief requested that

"[i]n the event the Department disagrees [with Kazchrome's request to use the

final invoice date], it should utilize the title transfer dates as the date of sale."

Letter from Baker McKenzie LLP, to U.S. Dep't of Commerce, entitled

"Kazchrome's Case Brief" (Jan. 14, 2025) at 6, PR 237, CR 488.

The Court concludes that the Final IDM did not contain a sufficient

explanation as to why Commerce continued to determine that the shipment date

"better reflect[ed] the date on which the exporter or producer establishe[d] the

material terms of sale."  19 C.F.R. § 351.401(i).  Commerce did not reference

adequately the record evidence that guided its determination that the presumption

in favor of the final invoice date should be overcome.  Id.; see also USEC Inc., 31

CIT at 1055, 498 F.Supp.2d at 1344–45; Nucor Corp., 33 CIT at 249, 612

F.Supp.2d at 1300; Antidumping Duties; Countervailing Duties, 62 Fed. Reg. at

27,348 ("If the Department is presented with satisfactory evidence that the material

terms of sale are finally established on a date other than the date of invoice, the

Department will use that alternative date as the date of sale.").  As discussed

earlier, the Court will not accept conclusory assertions that are unsupported by

record evidence as support for Commerce's determinations.  The Court holds that

Commerce's decision to use the shipment date as the date of sale was not in

accordance with law or supported by substantial evidence.  The Court remands this issue for further review and explanation.

## CONCLUSION

For the foregoing reasons, the Court remands the issues of YDD's sales to its United States customer and Kazchrome's date of sale for further consideration consistent with this Opinion.  The Court defers ruling on Commerce's application of partial AFA to YDD and Commerce's calculation of YDD's antidumping duty margin, pending the outcome of the sales determination on remand.  Accordingly, it is hereby

**ORDERED** that Commerce's Final Determination is remanded for further proceedings consistent with this opinion; and it is further

**ORDERED** that Commerce shall file the remand redetermination on or before August 7, 2026; and it is further

**ORDERED** that Commerce shall file the administrative record for the remand redetermination on or before August 21, 2026; and it is further

**ORDERED** that the Parties shall file comments in opposition to the remand redetermination on or before September 8, 2026; and it is further

**ORDERED** that the Parties shall file comments in support of the remand redetermination on or before October 8, 2026; and it is further

**ORDERED** that the joint appendix for the remand redetermination shall be filed on or before October 22, 2026.

                                                      /s/ Jennifer Choe-Groves
                                                      Jennifer Choe-Groves, Judge

Dated:     June 23, 2026
               New York, New York